Gerry PEARCE, Appellant,

v.

GENERAL AMERICAN LIFE INSUR-
ANCE COMPANY, Appellee.

No. 80–1112.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 13, 1980.

Decided Dec. 10, 1980.

Bruce Nangle, Clayton, Mo., for appellant.

Joseph M. Kortenhof, St. Louis, Mo., for appellee.

Before STEPHENSON and HENLEY, Circuit Judges, and HUNTER,* District Judge.

STEPHENSON, Circuit Judge.

Plaintiff Gerry Pearce appeals from a judgment for the defendant General American Life Insurance Company (General) on all five counts of plaintiff's suit for interest, damages and the return of premiums paid subsequent to plaintiff's accidental injury and resultant permanent and total disability. We affirm the district court[1] as to its ruling on Counts I, II and III of the complaint, but reverse and remand Counts IV and V for further proceedings to determine the amount which the plaintiff is entitled to receive as a refund for premiums improperly collected and for a decision on the merits of plaintiff's fraud claim under Count V.

## I. Background

Pearce was an employee of McDonnell Douglas Corporation (McDonnell) and while working in Thailand on behalf of McDonnell sustained serious injuries in an automobile accident on November 14, 1970. After initial treatment in Thailand, Pearce was returned to the United States, where he was hospitalized in El Paso, Texas, under the care of Dr. William J. Nelson. Pearce was eventually transferred to a hospital near to his home in Alamo Gordo, New Mexico.

---

* The Honorable Elmo B. Hunter, sitting by designation on this panel, is now Chief Judge of the United States District Court for the Western District of Missouri.

1. The Honorable Edward L. Filippine, United States District Court for the Eastern District of Missouri.

At the time of the accident, McDonnell carried several group insurance policies covering its employees which were issued by General American Life Insurance Company, of Missouri. Pearce was covered by three of those policies: (1) MCP–5350, Special Accident Insurance, with a maximum amount payable of $150,000 upon the occurrence of permanent and total disability suffered by the employee; (2) MCP–5090, Long Term Disability Income Insurance, paying sixty percent of normal monthly compensation at the time of disability, not to exceed two thousand dollars; and (3) MCP–5546, Additional Life and Accidental Death and Dismemberment Benefits, which offered an additional twelve thousand dollars life insurance and certain benefits for accidental death and dismemberment. The primary focus in this case is upon MCP–5350.

McDonnell deducted the employees' contribution toward the insurance premiums from their paychecks, and forwarded the premiums to General American. Although the employees so covered at the time of each payment of premium were not individually named, the total amount, representing the aggregate premiums owed for all the employees actually covered, was paid in one undifferentiated sum on a monthly basis.

On April 27, 1971, Pearce filed a claim with McDonnell for long–term disability benefits, under policy MCP–5090. In support of that claim, Dr. Nelson filed a report on or about May 5, 1971, indicating that Pearce was totally disabled from performing his or any other occupation, but predicted he could return to work about June 1971. Pearce's handwritten claim form, executed for him by his wife on April 27, 1971, also indicated that a June return date was possible.

Pearce thereafter went to St. Louis, Missouri, where he was treated by Dr. Herbert E. Rosenbaum. Dr. Rosenbaum filed a report, dated August 24, 1971, in which he stated, "I think this man is recovering nicely and we might expect that he will eventually be again employable." Pearce continued his treatment in St. Louis, and in early 1973, underwent rehabilitative treatment at the Jewish Hospital of St. Louis. On April 4, 1973, Dr. Rosenbaum reported that he had told Pearce to "spend a month regrouping all of his energies and emotional stamina," with the aim of beginning work at least on a half–time basis on the first of May 1973. Dr. Rosenbaum suggested observation for a period of one month in some work activity so that Pearce's employability in some aspect of the labor market could be determined.

In an attempt to return to his former duties at McDonnell, Pearce and his wife met with company representatives on April 11, 1973. Pearce was informed that McDonnell was unwilling to hire him back in his former position. He was advised at this meeting to apply for permanent total disability. In response, Mrs. Pearce wrote to Dr. Rosenbaum, who then filed a report that indicated Pearce was permanently and totally disabled, dated June 29, 1973. General American was advised on July 9, 1973, that, in addition to the prior claims filed under the long–term disability policies, Pearce was now filing for benefits for permanent and total disability under Policy MCP–5350.

In response to this notice, General American conducted its own investigation and on September 19, 1973, concluded that Pearce was indeed totally and permanently disabled. On September 25, 1973, General American issued its draft in the amount of $150,000 payable to Pearce under policy MCP–5350.

Pearce thereafter filed this five–count diversity suit. In Count I Pearce alleged that General improperly delayed payment for permanent total disability from December 15, 1970 until October 15, 1973, and that as a result he was entitled to interest of approximately $26,000.00 on the principle amount of the policy and interest of $7,320.00 on the interest claimed since October 15, 1973. In Count II Pearce alleged that the delay was vexatious, in violation of

Mo.Rev.Stat. § 375.420,[2] and claimed damages of $15,000.00 plus an attorney's fee of $12,500.00. Pearce alleged fraud in Count III, charging General with knowingly making a false representation with the intent to mislead Pearce by only tendering the $150,-000.00 insurance benefit, and in not paying the interest claimed. He prayed for the full amount of interest indicated in Count I, and for punitive and exemplary damages. In Count IV Pearce alleged that McDonnell wrongfully deducted premiums from his paycheck during the period of his disability, totalling $711.56, and claimed a refund in that amount and interest of $172.00. In Count V Pearce accused General of fraud in regard to the transaction alleged in Count IV, and claimed the premium and interest set out in Count IV and punitive and exemplary damages in the amount of $250,000.00.

After trial to the court, judgment was rendered in favor of the defendant General American on all counts. The court found specifically that:

> under the facts noted herein that there was no notice of *permanent* total disability communicated to General American until July 9, 1973. The Court finds further that McDonnell could not have reasonably known that plaintiff was permanently totally disabled, or claiming to be so situated, until the time of plaintiff's application in July of 1973 and Dr. Rosenbaum's statement dated June 29, 1973.

(emphasis added). Accordingly, the court found that there was no improper delay on the part of General, and therefore no viable claim for interest, as alleged in Count I. Further, having found no improper delay under Count I, the court found no vexatious delay, as alleged in Count II, and no violation of Mo.Rev.Stat. § 375.420. Pearce's claim under Count III was likewise denied. Since no wrongful delay was found, the

court declined to provide a detailed recitation of the elements of fraud. Pearce's claims under Counts IV and V were denied on the grounds that such claims were properly brought against McDonnell, since the policies between General and McDonnell were for the benefit of certain McDonnell employees, and that McDonnell paid premiums to General and only advised General of the number of employees so covered, and did not indicate the specific employees by name.

## II. Permanent and Total Disability Claims (Counts I, II & III)

The thrust of Pearce's claim is that McDonnell either knew or should have known that Pearce was totally and permanently disabled when he first filed his claim for long-term disability benefits in April 1971, under policy MCP-5090, and that this knowledge is imputable to General. This claim may be answered by a review of the terms of the policy.

As a general rule, plain and unambiguous language will be given its ordinary meaning and effect; the need to resort to construction arises only when an ambiguity exists. *Kyte v. Fireman's Fund American Insurance Companies,* 549 S.W.2d 366, 367 (Mo.App.1977). The language in the policy is ambiguous where it is reasonably susceptible of two interpretations. *Id.* at 368. Such ambiguities are construed against the insurer, and in favor of the insured. *Williams v. North River Insurance Company,* 579 S.W.2d 410, 412 (Mo.App.1979). But where a term is defined in the policy, the court must look there and nowhere else, *McManus v. Equitable Life Assurance Society of the United States,* 583 S.W.2d 271, 272 (Mo.App.1979).

The crucial issue is the determination of when proof of "permanent total disability"

**2.** The statute reads:

In any action against any insurance company to recover the amount of any loss under a policy of * * * health, accident * * * insurance * * * if it appears from the evidence that such company has refused to pay such loss without reasonable cause or excuse, the court or jury may, in addition to the amount

thereof and interest, allow the plaintiff damages not to exceed twenty percent of the first fifteen hundred dollars of the loss, and ten percent of the amount of the loss in excess of fifteen hundred dollars and a reasonable attorney's fee; and the court shall enter judgment for the aggregate sum found in the verdict.

was presented to and accepted by General American. Policy MCP–5350 provides in pertinent part:

If an employee less than age 60 sustains an accidental bodily injury while insured for the Special Accident Insurance and as a result of that injury, directly and independently of all other causes, becomes Totally Disabled within 30 days after the date of the accident in which the injury is received, *the Company will, immediately upon receipt of proof of Permanent Total Disability, satisfactory to the Company,* and as a result of such injury, pay the employee the Maximum Amount applicable to the employee at the time the injury is sustained less any amount previously paid under this Special Accident Benefit to or on behalf of the employee as a result of the same accident.

\* \* \* \* \* \*

As used in this provision:

"Total Disability" means the employee is completely prevented from performing the duties of his occupation.

"Permanent Total Disability" means the employee is completely prevented from performing any work or from engaging in any occupation or employment for wage or profit *for 12 months and presumably will remain so disabled for the remainder of his lifetime.*

(emphasis added). In addition to these provisions regarding disability, the policy contains conditions regarding notice. These portions read:

Written notice of claim must be given to the Company within twenty days after occurrence or commencement of the loss on which claim is based. \* \* \* Notice given by or on behalf of the claimant to the Company at its home office, authorized claim office, or to any authorized agent of the Company with particulars sufficient to identify the person with respect to whom benefits are claimed as an insured individual shall be deemed to be notice to the Company.

\* \* \* \* \* \*

Affirmative proof of claim must be furnished to the Company at its home office or authorized claim office, within ninety days after the date of such loss.

Failure to furnish notice of proof of claim within the time provided in the Group Policy shall not invalidate nor reduce any claim if it shall be shown not to have been reasonably possible to furnish such notice or proof within such time and that such notice or proof was furnished as soon as possible thereafter.

Accordingly, if proof of "permanent total disability," as defined in the policy, was not furnished until June or July of 1973, the district court must be affirmed.

 Pearce was injured on November 14, 1970. He became totally disabled, within the definition of the policy, on or about that date. However, his first claim for benefits was made on April 27, 1971, and was filed on a form entitled LONG–TERM DISABILITY INCOME. The report filed by Dr. Nelson on May 5, 1971, indicated that Pearce was "improved" and predicted a return–to–work date of June 1971. Pearce was, at that time, still "totally disabled." Likewise, when Dr. Rosenbaum filed his first report in August of 1972, Pearce was still "totally disabled," but future recovery and return to employment were still predicted. Not only did Pearce not qualify for "permanent total disability" at this time because he was not "presumably" so disabled for the remainder of his life, he also had not yet been totally disabled for a period of twelve months, expressly required under the policy. It is only after the initial twelve months had elapsed that Pearce could be considered for permanent total disability benefits, according to the terms of the policy. The only exhibits introduced which originated after the first year following the accident were reports from Dr. Rosenbaum made in 1973. These reports still indicated that, although totally disabled within the definition of the policy, rehabilitation and a return to work were contemplated. Pearce thus could not claim to be "presumably" totally disabled for the remainder of his life. It was only after the April 11, 1973, meeting with the McDonnell

representatives that Pearce considered himself to be "permanently" disabled, and he then so requested Dr. Rosenbaum to file a final report and for the first time filed a claim for benefits under policy MCP–5350.

This course of action is in accord with the provisions of the policy noted above. In particular, failure to furnish notice within the ninety–day period would not reduce any claim if such failure was shown to have been because such notice was not "reasonably possible" and if notice was furnished as soon thereafter as possible. It was not "reasonably possible" to furnish notice of presumed lifetime total disability, because such disability was not expected, contemplated or claimed until April 1973. And, as soon as Pearce realized that he could not return to his former employment, he filed notice, precisely as required by the "as soon as possible thereafter" language of the policy. And, in accordance with the policy, the claim for benefits was not disputed or reduced by General American, even though the claim and proof were not filed until more than two and one–half years had elapsed.

The finding that McDonnell had no knowledge of Pearce's alleged permanent and total disability prior to July 1973, obviates the necessity of determining McDonnell's status vis a vis General American on this issue. Generally, the knowledge of an agent is imputed to an insurer, and conversely, where the agent has no knowledge there can be no such imputation. *See Macalco, Inc. v. Gulf Insurance Co.*, 550 S.W.2d 883, 894 (Mo.App.1977). We affirm the district court's conclusion that General's payment of the $150,000.00 claim in September 1973, after receipt of notice of the claim in July 1973, was entirely reasonable.

It follows that there was no vexatious delay by General as charged in Count II, and therefore no basis for invoking Mo.Rev. Stat. § 375.420. Similarly, the claim of fraud on the part of General in refusing to tender interest, as charged in Count III, is without merit. Accordingly, the district court is affirmed as to Counts I, II and III.

### III. Deduction of Premium Claims (Count IV & V)

The district court's findings of fact and conclusions of law are silent regarding whether the premium deductions were erroneous, as alleged by Pearce, except to indicate that the question will not be considered because the claim should have been brought against McDonnell. Regardless of which party is the proper target for the recovery claim, it is first necessary to determine if premiums were in fact waived under the terms of the policy as a result of Pearce's disability.

■ Pearce was covered by three McDonnell group policies. None of the three policies has an actual "waiver of premium" clause which would become operative upon the disability of the insured. However, there is language which leads this court to conclude Pearce's coverage terminated after his disability commenced. We construe the contract as a whole, and insofar as it is open to different constructions, adopt that construction most favorable to Pearce as the insured. *McNeal v. Manchester Insurance & Indemnity Company*, 540 S.W.2d 113, 120 (Mo.App.1976).

The policy provisions giving rise to an ambiguity are those which deal with eligibility and termination of eligibility. The language of all three policies is identical. Eligible classes are defined as:

The eligible classes under the Group Policy are made up of Salaried employees of the Policyholder and its associated companies, if any, as defined in the Group Policy, including any amendment thereto (herein referred to separately as "employer"). *Your eligibility is subject to the performance of active work on a full–time basis, as defined herein.*

As used in the Group Policy, *"active work on a full–time basis" means the performance of work by the employee for his employer* either at his customary place of employment or such other place or places as required by his employer in the course of such work *for the full number of hours and full rate of pay* in accordance with the established employment practices of his employer.

(emphasis added). The termination provisions of the policies provide that:

> The personal insurance of each employee shall terminate *automatically* on the earliest of the following dates:
>
> 1) the date the employee *ceases to perform active work on a full–time basis* in an eligible class;

(emphasis added).

According to the language of the policy, Pearce's insurance *automatically* terminated when he ceased to perform active work on a full–time basis. The policy defined that phrase to mean working the full number of hours, for the full salary, at the customary or designated place of employment. The date of such termination, then, was November 14, 1970, the date that Pearce was injured as a result of the automobile accident. He ceased working altogether, and thus was no longer eligible under the terms of the policy.

General American counters that Pearce made no showing that he did not actually receive the coverage that he was paying for after he became disabled. However, this argument is not persuasive. First, having once become totally disabled, Pearce could not during the course of such disability become totally disabled a second time. Even if such an illogical proposition is accepted, it begs reason to assume that General American would have paid double under the policies. Second, under the terms of the policy, had Pearce tried to claim double benefits or coverage, General American likely would have raised as a defense lack of coverage. Therefore, it is apparent that the premium should have been considered waived on the date the disability began, since Pearce was no longer eligible for coverage under the policies.

Pearce alleges that premiums were collected erroneously by McDonnell, that McDonnell was the agent of General American, and that, therefore, the premiums so collected should be refunded to him by General American. General American, to the contrary, alleges that there is no proof as to the erroneous nature of the deductions, and even if there was sufficient proof, that

Pearce's right is against McDonnell only. General relies upon *Longley v. Prudential Insurance Company of America*, 161 S.W.2d 27 (Mo.App.1942), and *Satz v. Prudential Insurance Company of America*, 225 S.W.2d 480 (Mo.App.1949). Both of these cases held that the employer, when authorized by the employee to deduct premium contributions from the paycheck, was an agent of the *employee*, and not an agent of the insurer. However, both of these cases also indicated that the employee is a mere third–party beneficiary of the insurance contract entered into between the employer and the insurer. The status of the employee in such a situation has, however, now. changed. In *Morris v. Travelers Insurance Company*, 546 S.W.2d 477 (Mo.App.1976), the court held that "the holdings of the Missouri cases are in accord with the notion of a direct contractual relation between the insured and the insurer." *Id.* at 485. Thus, the holdings of *Longley* and *Satz* must be tempered by the currently recognized status of an insured employee as something more than a mere third–party beneficiary.

The question is, then, has General designated McDonnell as its agent? Under the certificate, MCP–5350, notice of claim may be made at an "authorized claim office;" in this case, notice was made to McDonnell. *Morris, supra*, held that a direct contractual relationship exists between the insurer and insured employee, and found as a logical next step that the certificate furnished to such employee constituted part of the insurance contract. *Morris v. Travelers Insurance Company, supra*, 546 S.W.2d at 477. There is no doubt that General designated McDonnell as its agent for the purpose of accepting claims. *See Coleman v. Metropolitan Life Insurance Company*, 127 S.W.2d 764, 770 (Mo.App. 1939); *Sullivan v. John Hancock Mutual Life Insurance Company*, 110 S.W.2d 870, 874 (Mo.App.1937). Although the policies in *Coleman* and *Sullivan* specifically directed that such notice be given to the employer, and in the instant case the policy only referred to an "authorized claims office," the actions of McDonnell and General in

accepting and handling notices indicated that a *de facto* agency exists, just as an expressed agency was found in *Coleman* and *Sullivan.*

More recently, the Missouri Court of Appeals has held that the status of an employer in a group insurance policy situation as an agent of the insurer is a question to be determined by the particular facts of each individual case. *Burckhardt v. General American Life Insurance Company,* 534 S.W.2d 57, 67 (Mo.App.1975). The *Burckhardt* court also noted *Brookshire v. Metropolitan Life Insurance Company,* 56 S.W.2d 817, 819 (Mo.App.1933), which found an agency on the part of the employer for a limited purpose. In *Brookshire* the insurer forwarded a benefit check to the employer for delivery to the widow of the insured. There was no evidence why this arrangement was made; apparently such delivery was not specified in the policy. The court held that the delivery to the employer "presumptively constituted the [employer] its agent for *that* purpose * * *." *Id.* at 819 (emphasis added). It is thus clear that an employer can be the agent of the insurer even in the absence of direct authorizing language in the policy, and that this determination will be based upon the specific facts of each case.

Careful review of the aforementioned cases and principles reveals that McDonnell was the agent of General American, not only for notice of claim but also for the collection of premiums. The certificate makes only oblique reference to payment of premiums, speaking only in terms of authorizing "contributions." In contrast, the certificate specifically requires that notice of claim be given to the company at its home office, authorized claims office, or any authorized agent.

■ Where a term is used in one phrase of a policy, its absence in another phrase is significant. *Williams v. North River Insurance Company, supra,* 579 S.W.2d at 412. In the context of this policy, precise instructions were articulated for the process of making a claim, yet none were given for the payment of premium. It is a fair infer-

ence that the other party to the contract, McDonnell, was responsible for the collection and forwarding of premiums. By authorizing contributions, the employee had done his part toward payment of premiums. If such payments were made to McDonnell, in the absence of specific instructions in the certificate, it is not unreasonable to assume that General designated McDonnell as its agent for *that purpose,* that is, the collection of premiums from insureds who stand as co–equals under the contract with McDonnell.

Recognition of such a designation for a limited purpose, even in the absence of policy language, is authorized under the rule espoused in *Brookshire v. Metropolitan Life Insurance Company, supra,* 56 S.W.2d at 817. The policy does not direct the employees to pay the premiums in any particular manner, except by authorizing contributions. This is, reasonably, a directive to the insured employee to pay premiums to the employer. Thus, General has designated McDonnell as its agent for the receipt of premiums. Under established rules of agency law, acts within the scope of the agency committed by the agent are imputable to the principal. Therefore, if McDonnell erroneously withheld premium contributions from Pearce's paycheck, then General American is answerable for McDonnell's acts.

The trial court, in its conclusions of law, did not reach the question of improper deduction in regard to General American, on the grounds that such a claim should be brought against McDonnell. The trial court also noted the paucity of evidence in the record pertaining to the receipt of funds by General. Further, neither party fully briefed nor discussed this matter. Therefore, the case is remanded on these issues for further proceedings to determine the amount of premiums which were deducted after the date of disability by McDonnell, and if those funds were forwarded to and received by General.

### IV. Deposition Expenses

The final matter for determination is the trial court's denial of Pearce's motion, based

on Fed.R.Civ.P. 37(c), for expenses incurred in connection with requests for admission filed by Pearce and directed to General American. Although the record is unclear, the following appears to be the situation. Pearce requested General American to admit that certain signed medical authorizations were in the files of various doctors. General American searched its files and replied that it could neither admit nor deny the requested admission because it had no records which would indicate whether or not the doctors had such authorizations in their files. Pearce's counsel proposed deposing the record custodians of the various doctors involved. General American then agreed to stipulate to the accuracy of the records, if Pearce's counsel would give his assurance that the records had actually been obtained from the doctors' files. Pearce's counsel refused to so stipulate, and scheduled depositions in El Paso, Texas, and Alamo Gordo, New Mexico. Further, in addition to stenographic reporting, the plaintiff's counsel arranged for video tape recording, at a cost of $1,250. The total amount claimed by the plaintiff in connection with this discovery was $5,230.93.

Rule 37(c) requires a party to pay the reasonable expenses incurred in proving the truth of a matter which is the subject of a request for admission where that party earlier refused to admit that same issue. Fed.R.Civ.P. 37(c). However, as one of the four exceptions, the rule provides that the trial court may refuse to invoke the rule where there was "good reason" for the failure to admit.

■ In view of the facts, the trial court certainly was well within its discretion in denying Pearce's motion. General American showed that it had "good reason" to not admit the matters requested. The request appears to simply have asked for information that was not available to General American. It is difficult to justify extensive and expensive discovery when the defendant agreed to stipulate to the truth of the matters, and when the issue apparently could have been settled by correspondence. *See Bateman v. Standard Brands, Inc.,* 9 F.R.D. 555 (W.D.Mo.1949).

Accordingly, the district court is affirmed in its holdings on Counts I, II and III of the petition. Counts IV and V are remanded for further proceedings.